UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. _____

<u>Jose Aguirre</u>,

    Plaintiff, on Behalf of a Putative Class,

vs.                                        **CLASS ACTION COMPLAINT**

<u>DraftKings, Inc.</u>,

    Defendant.

_____/

Jose Aguirre ("Plaintiff"), individually and on behalf of similarly situated customers (the "Class") of DraftKings, Inc. ("DraftKings," or "Defendant"), hereby commences an action against DraftKings seeking injunctive relief and monetary damages resulting from DraftKings' deceptive and unfair trade practices and fraud against Plaintiff and the Class. As support therefor, Plaintiff states as follows:

## INTRODUCTION

### PARTIES

1. Plaintiff is a citizen of the United States and of the State of Florida. He resides in Miami, Florida, within the Southern District of Florida.

2. DraftKings, Inc. is an online fantasy sports gambling business.

3. DraftKings is incorporated under the laws of Delaware. The corporation's headquarters, nerve center, and principal place of business is the city of Boston in the Commonwealth of Massachusetts.

4. DraftKings legally hosts online fantasy sports betting for residents of 45 of the 50 United States and the District of Columbia.

5. From computers and other devices in their home states and elsewhere, customers access DraftKings' Internet site, deposit money, and engage in fantasy sports competition with other customers nationwide, wagering various sums of money in an array of contests.

6.  DraftKings advertises its services nationally, including within the Southern District of Florida, both on television and over the Internet.

## JURISDICTION

### Personal Jurisdiction

7.  This Court has personal jurisdiction over DraftKings because the corporation has extensive, purposeful contacts in Florida, including contacts with all Class members.

8.  DraftKings has advertised profusely in Florida and has accepted payment from citizens of the Southern District of Florida over the Internet.

9.  The corporation has thus purposefully availed itself of the benefits and protections of Florida such that DraftKings should reasonably anticipate being haled into court herein.

10. Applying the substantive law of Florida to the claims of Plaintiff and the Class would violate neither the Due Process Clause of the Fourteenth Amendment to, nor the Full Faith and Credit Clause of, the Constitution of the United States.

### Subject Matter Jurisdiction

11. The putative Class consists of 100 or more persons. The amount in controversy, exclusive of costs and interest, exceeds $5,000,000. Moreover, a member of the Class is a citizen of a State different than the defendant. This Court thus has original jurisdiction pursuant to the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d).

12. Additionally, the matter in controversy exceeds $75,000, exclusive of costs and interest, and no Class member is a citizen of the same state as DraftKings. This Court thus also has diversity jurisdiction. 28 U.S.C. § 1332(a)(1).

## VENUE

13. As DraftKings is subject to the personal jurisdiction of this Court, the Defendant, a corporation, is considered a resident of the Southern District of Florida for venue purposes. 28 U.S.C. § 1391(c)(2). Because venue may always lie in the district in which a defendant resides, 28 U.S.C. § 1391(b)(1), venue is proper in the Southern District of Florida.

14. Moreover, the Class, from their computers and devices in Florida, deposited money with DraftKings via the Internet. DraftKings' misleading advertisements also reached the Southern District of Florida via television and the web. Through its deceptive practices, DraftKings harmed

Plaintiff and the Class in Florida. Accordingly, a substantial part of the events or omissions giving rise to the claim occurred in this District. Venue is thus proper pursuant to Section 1391(b)(2).

## FACTS UNDERLYING CLAIM FOR RELIEF

15. Daily fantasy sports wagering has, in a mere three years, grown from non-existence into an industry poised to bring in $31 billion in player entry fees by the year 2020. Riding the wave of popularity, DraftKings has emerged as the No. 2 player in the field, solidifying this market share by buying the No. 3 and No. 4 daily fantasy sites in blockbuster 2014 deals.

16. DraftKings is an online casino—a legal one. Congress has deemed fantasy sports a game of skill, not of chance, thereby legitimizing online fantasy sports wagering. DraftKings and other sites—including industry leader FanDuel, Inc.—generate their revenue by hosting competitions among individual users nationwide and, for their services, taking a "rake" of the earnings.

17. Though the rake varies by game type and amount, it normally hovers around 10 percent. In a typical competition wherein 10 players bet $10 each in a winner-takes-all format, the champion will walk away with $90 of the $100, with DraftKings taking its 10 percent rake of $10.

18. Utilizing this model, DraftKings awarded an aggregate $200 million in prizes to its nearly 1 million registered users in 2014. During each month in 2014, an estimated 200,000 participants actively bet on fantasy sports on DraftKings.com.

19. DraftKings has become so popular that major sports leagues, teams, and events have inked promotional partnerships with the site. In early 2014, the rival FanDuel, Inc. made headlines by signing an agreement with the National Basketball Association ("NBA"), then partnered with five NBA teams as well as the Washington Redskins franchise of the National Football League ("NFL"). DraftKings countered by signing deals with, *inter alia,* Major League Baseball ("MLB") and three MLB teams, the National Hockey League ("NHL") and seven NHL teams, the New England Patriots, the Pittsburgh Steelers, the Breeders Cup, and the World Series of Poker.

20. The competitions vary by sport and format, but perhaps the most popular betting forum is daily or weekly fantasy football. In a typical competition, customers bet their "buy-in"— anywhere from $1 to thousands of dollars—against other participants with hopes that they will field the best fantasy football "team." Customers, bound by a fictitious salary cap but betting real money, select a roster of players they believe will perform well in terms of individual statistics.

21. To lure customers, DraftKings saturates television, particularly commercials airing during sporting events, with seductive advertising. Through November of 2014, DraftKings had run 1,782 separate television ads in the year 2014 alone. "DraftKings combines one-day fantasy sports with winning life-changing amounts of cash," one commercial boasts. Another tells the story of DraftKings customer Derek Bradley, a former accountant. "DraftKings one-day fantasy baseball took him from a guy with holes in his underpants," the announcer states, "to a guy with bikini models in them!" The commercial promises that if one signs up for DraftKings, the site will "double [his or her] deposit."

22. Internet advertisements, on the DraftKings website and elsewhere, likewise funnel significant business to its online betting interface.

23. As part of this advertising scheme, DraftKings entices fantasy sports players with promotions intended to make individuals believe that up to $600 of their initial deposits will be immediately matched by the site. DraftKings thereby signals to potential customers that if, for example, they deposit $200, they will immediately have $400 with which to wager.

24. Indicative of this ploy is a DraftKings Internet video advertisement featuring a representative touting the superiority of DraftKings over FanDuel.com and other betting sites. The spokesman offers the "best DraftKings deal anywhere online":

> You're going to double your first deposit, up to $600! That means that if you put in $100, you get $200 to play with. Put in $300, and get $600. Put in $600, and get $1,200. No other site can offer you this.

25. When potential customers go to DraftKings.com, they encounter a banner headline proclaiming, "Receive a 100% First-Time Deposit Bonus." Directly below, the user is directed to a heading entitled "CLAIM FREE OFFER >>."

26. Upon clicking on the "CLAIM FREE OFFER" heading, customers are routed to a page designed to register new users. After choosing a username and password and providing demographic information, the customer is directed to click on a heading entitled "Register."

27. Upon clicking on the "Register" heading, the site directs customers to the "Deposit" page. Customers are immediately put on notice that they must deposit their cash quickly, lest they lose the 100-percent match. A large, prominently displayed count-down clock starts at 10:00 and ticks down by the second. Above the clock, a headline beckons customers: "[D]eposit now and we'll DOUBLE YOUR CASH, up to $600*! Get started now!" Directly below the clock are four large text boxes, allowing customers to choose from the following deposit amounts and receive the

corresponding bonuses: "[1] $25: $25 Free Bonus; [2] $100: $100 Free Bonus; [3] $250: $250 Free Bonus; [4] $600: $600 Free Bonus." After making a selection and entering payment information, the customer is directed to a deposit confirmation page.

28.     Upon receiving deposit confirmation, customers learn that the ubiquitously advertised, 100-percent deposit match is nothing more than a façade. Despite promises in video promotions, on the main DraftKings webpage, and within the large text boxes where customers choose their deposit amount, a customers' $100 does **not** become $200 upon deposit.

29.     Indeed, customers receive **no money** upon depositing. They discover, instead, that they must incur an additional and substantial monetary obligation in order to "double" their deposit.

30.     Specifically, customers must enter fantasy contests and receive bonuses in incredibly small increments. Rather than the guaranteed, instant, 100 percent deposit match, customers receive as a bonus a mere **4 percent** of every dollar they put into play.

31.     In this case, Plaintiff deposited $25. He did not, as promised, receive an additional $25 so that he would have $50 total with which to wager. *See* ¶ 24, *supra* (quoting DraftKings video promising customers that its deposit match "means if…you put in $100, you get $200 to play with," and so forth with various amounts up to $600).

32.     Instead, **when Plaintiff wagered $25 on multiple fantasy contests, he received $1**, or 4 percent of the $25 deposit.

33.     Plaintiff would have to not only deposit the original $25, but also deposit an additional $600, then wager all $625, in order to receive the $25 "double deposit" bonus. Plaintiff thus would have to deposit 25 times, or 2500%, the advertised amount in order to receive the promised, "Free," $25 deposit match.

34.     A Class member who has deposited $600 would actually have to deposit $14,400 more, then gamble with all $15,000, in order to get the "guaranteed" $600 bonus and thus have the promised $1,200 with which to wager.

## CLAIMS

<u>COUNT 1</u>: CLASS ALLEGATIONS FOR DAMAGES RELATED TO *PER SE* VIOLATION OF FDUTPA BY FALSE ADVERTISEMENT OF "FREE" GOODS AND SERVICES

35.     Plaintiff hereby incorporates by reference the preceding allegations as if fully set forth herein.

36.     The Florida Free Gift Advertising Law "recognizes that the deceptive misuse of the term 'free' and words of similar meaning and intent in advertising by the unscrupulous has resulted in deception of consumers, leading them unknowingly to assume contractual obligations which were initially concealed by the deception." Fla. Stat. § 817.415(1)(a).

37.     In Florida, it "is the intent of the Legislature to prevent such deception by requiring disclosure of all contingent conditions, obligations, or considerations in any form in connection with the advertising of goods or services using the term 'free' or words of similar meaning and intent." Fla. Stat. § 817.415(1)(b).

38.     The legislature has enumerated specific requirements for advertisements containing the word "free": "Advertising in which items are offered as free with conditions or obligations necessary to acceptance shall include a clear and conspicuous statement of any such conditions or obligations…" Fla. Stat. § 817.415(5).

39.     The definitions portion of the advertising law provides that

> "[f]ree" includes the use of terms such as "awarded," "prize," "absolutely without charge," "free of charge," and words or groups of words of similar intent which reasonably lead a person to believe that he or she may receive, or has been selected to receive, something of value, entirely or in part without a requirement of compensation in any form from the recipient."

Fla. Stat. § 817.415(3)(b).

40.     Any violation of the advertising law "is declared to be a deceptive trade practice and unlawful." Fla. Stat. § 817.415(6).

41.     Here, DraftKings promised Plaintiff and the Class that they would "***double*** [their] first deposit up to $600," clarifying, "[t]hat means that ***if you put in $100, you get $200 to play with***." On its website, DraftKings states that new depositors will "Receive a 100% First-Time Deposit Bonus" if they "CLAIM [their] **FREE** OFFER" (bolding, but not capitalization, added). DraftKings assured Plaintiff and the Class that the site would "DOUBLE [THEIR] CASH" upon deposit. It further promised Plaintiff and the Class that if they deposited $25, they would get a "$25 ***Free*** Bonus"; if they deposited $100, they would get a "$100 ***Free*** Bonus"; if they deposited $250, they would get a "$250 ***Free*** Bonus"; and if they deposited $600, they would get a "$600 ***Free*** Bonus." (emphasis added).

42.     For Plaintiff to receive his "Free $25 Bonus," however, he would be forced to bet the $25 already deposited **and** deposit $600 more **and** gamble with that $600. Only then would

DraftKings fulfill its promise: A dollar-for-dollar match of the original, $25 deposit. A Class member who deposited $600 in expectation of a $600 bonus match would have to bet the $600 already deposited **and** deposit $14,400 **and** gamble with that $14,400. Only then would DraftKings make good on its promise to match, dollar for dollar, the original, $600 deposit.

43. In other words, Plaintiff and the Class, having been promised a free good, were forced to undergo additional "conditions or obligations necessary to acceptance," Fla. Stat. § 817.415(5)—that is, forced to deposit and gamble with an exorbitant amount of money—in order to receive the "free" deposit match. Because DraftKings did not provide a "clear and conspicuous statement of any such conditions or obligations," Fla. Stat. § 817.415(5), necessary to receive the deposit match, DraftKings' failure to award the promised bonus violated the advertising law as concerns Plaintiff and all other members of the Class.

44. In promulgating the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq., the legislature sought to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

45. An entity violates this statute by, *inter alia*, violating "any **law**, statute, rule, regulation, or ordinance which **proscribes** unfair methods of competition, or **unfair, deceptive, or unconscionable acts or practices**." Fla. Stat. § 501.203(3)(c) (emphasis added).

46. DraftKings' violation of the Florida Free Gift Advertising Law, Fla. Stat. § 817.415—a **law** that **proscribes unfair, deceptive, or unconscionable acts or practices**—thus constituted a *per se* violation of FDUTPA.

47. DraftKings' deceptive and unfair trade practices proximately caused Plaintiff and the Class monetary damages consisting of the full amounts of their initial deposits, ranging from $1 to $600, as well as incidental damages.

48. WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief in the following form:

  1) Certification of the Class, appointment of Plaintiff as representative of the Class, and appointment of Plaintiff's counsel as Class Counsel;
  2) Money damages;
  3) Pre- and post-judgment costs and interests, as authorized by law;

4) An injunction prohibiting further deceptive advertising as described herein, as authorized by Section 501.211(1), Florida Statutes;

5) An injunction requiring DraftKings to provide the promised, dollar-for-dollar match without any additional deposits or gambling by Class members;

6) Reasonable attorney's fees and costs; and

7) Such other and further relief as this Court may deem just and proper.

COUNT 2: CLASS ALLEGATIONS FOR DAMAGES RELATED TO VIOLATION OF FDUTPA BASED ON CONDUCT **OTHER THAN** FALSE ADVERTISEMENT OF "FREE" GOODS AND SERVICES

49. The Plaintiff hereby incorporates by reference the preceding allegations as if fully set forth herein.

50. FDUTPA is designed to "protect the consuming public...from those who engage in…unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

51. Within the meaning of FDUTPA, Plaintiff and each Class member are "consumer[s]"; DraftKings' fantasy sports competitions are "services," and the purported dollar-for-dollar match is a "good"; and DraftKings, by operating its fantasy sports betting site, is engaged in "commerce." *See* Fla. Stat. § 501.203.

52. FDUTPA protects consumers by, *inter alia*, creating a private right of action against defendants, like DraftKings, who violate the act by engaging in unscrupulous business practices.

53. DraftKings' promise to Plaintiff and the Class of a 100 percent deposit-match bonus—and subsequent failure to provide that bonus, and/or its conditioning of receipt of the bonus upon an inadequately disclosed set of conditions that includes gambling with exorbitant, additional amounts of money—constitutes an unfair or deceptive practice within the meaning of FDUTPA.

54. DraftKings' deceptive and unfair practices proximately caused Plaintiff and the Class monetary damages consisting of the full amounts of their initial deposits, ranging from $1 to $600, as well as incidental damages.

55. WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief in the following form:

1) Certification of the Class, appointment of Plaintiff as representative of the Class, and appointment of Plaintiff's counsel as Class Counsel;

2) Money damages;

3) Pre- and post-judgment costs and interests, as authorized by law;

4) An injunction prohibiting further deceptive advertising as described herein, as authorized by Section 501.211(1), Florida Statutes;

5) An injunction requiring DraftKings to provide the promised, dollar-for-dollar match without any additional deposits or gambling by Class members;

6) Reasonable attorney's fees and costs; and

7) Such other and further relief as this Court may deem just and proper.

COUNT 3: FRAUD IN THE INDUCEMENT

56. The Plaintiff hereby incorporates by reference the preceding allegations as if fully set forth herein.

57. DraftKings made numerous and repeated false statements of material fact on its website, in video advertisements, and in television advertisements.

58. The most egregious of these false and misleading statements is reflected in DraftKings' promise to Plaintiff and the Class to "double [their] first deposit up to $600," clarifying, "[t]hat means that if you put in $100, you get $200 to play with." On its website, DraftKings states that new depositors will "Receive a 100% First-Time Deposit Bonus" if they "CLAIM [their] FREE OFFER" (bolding, but not capitalization, added). DraftKings assured Plaintiff and the Class that it would "DOUBLE [THEIR] CASH" upon deposit. It further promised Plaintiff and the Class that if they deposited $25, they would get a "$25 Free Bonus"; if they deposited $100, they would get a "$100 Free Bonus"; if they deposited $250, they would get a "$250 Free Bonus"; and if they deposited $600, they would get a "$600 Free Bonus."

59. DraftKings had actual knowledge that these statements were false and misleading.

60. Alternatively, DraftKings should have known that these statements were false and misleading and likely to induce consumers to deposit money where they may not otherwise do so.

61. By disseminating these deceptive advertisements, DraftKings intended the representations contained therein to induce consumers throughout the Florida to deposit money. DraftKings had actual knowledge, or should have known, that its advertisements would lead consumers to expect a dollar-for-dollar deposit match.

♦Law Office of Mason Kerns ♦

62. DraftKings' deceptive advertisements, and the Plaintiff's and the Class' subsequent reliance on said advertisements, proximately caused monetary and incidental damages to Plaintiff and the Class.

63. WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief in the following form:

1) Certification of the Class, appointment of Plaintiff as representative of the Class, and appointment of Plaintiff's counsel as Class Counsel;
2) Money damages;
3) Punitive damages
4) Pre- and post-judgment costs and interests, as authorized by law;
5) An injunction prohibiting further deceptive advertising as described herein, as authorized by Section 501.211(1), Florida Statutes;
6) An injunction requiring DraftKings to provide the promised, dollar-for-dollar match without any additional deposits or gambling by Class members;
7) Reasonable attorney's fees and costs; and
8) Such other and further relief as this Court may deem just and proper.

## CLASS ALLEGATIONS

64. Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

65. The putative Class Plaintiff seeks to represent comprises:

> All Florida citizens who deposited money into a DraftKings account based upon DraftKings' advertisement of the deposit-match bonus described herein.

66. Plaintiff reserves the right to amend the Class parameters to account for facts learned through discovery, and to have the class divided into appropriate subclasses pursuant to Rule 23(c)(5), Federal Rules of Civil Procedure.

67. Certifying and maintaining this cause as a class action is both appropriate and necessary given the nature of the claims and in light of the following factors, tracking Rule 23, Federal Rules of Civil Procedure:

68. **"[T]he class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).** DraftKings' deceptive trade practices likely affected each of its nearly 1 million depositors nationwide during the pendency of its online advertising and promotion scheme.

Given DraftKings' pervasive Florida advertising, it is likely a larger proportion of the nationwide depositors are Florida citizens than the population numbers alone would forecast. Florida citizens account for 6.3% of the United States population. If the proportion of Florida DraftKings depositors was merely proportional to Florida's population relative to that of the United States, the Class would consist of more than 63,000 members. Plaintiff estimates that the Class has between 20,000 and 100,000 members—a figure far in excess as of the Class Action Fairness Act minimum of 100 persons and far too large to render joinder of separate actions a reasonable possibility.

69.     **"[T]here are questions of law common to the class." Fed. R. Civ. P. 23(a)(2).** *All* conceivable, pertinent questions of law—including interpretation of the operative legislation, Sections 817.415 and 501.201 et seq., Florida Statutes—that may arise in this matter will be common to the entirety of the class.

70.     **"[T]he claims or defenses of the representative part[y] [is] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).** Plaintiff encountered the same deceptive advertisements, in the same location, on the same website as; was induced by the advertisements in the same or similar manner as; deposited money while viewing the same screen as; and suffered monetary damages in the same proportional amount as all other members of the Class.

71.     **"[T]he representative part[y] will fairly and adequately protect the interests of the class." Fed. R. Crim. P. 23(a)(4).** Plaintiff is fully dedicated to seeking vindication on behalf of those who were similarly duped by DraftKings' deceptive advertising and bonus scheme. He has the capacity, time, and resources to do all that he reasonably can to ensure that all Class members are fairly compensated.

72.     Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications, thereby establishing incompatible standards of conduct for DraftKings. *See* Fed. R. Civ. P. 23(b)(1)(A).

73.     Separate actions would also risk adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications. Such adjudications could substantially impair or impede individual claimants' ability to protect their interests. *See* Fed. R. Civ. P. 23(b)(1)(B).

74.     Plaintiff is seeking injunctive relief on behalf of himself and the putative Class. Because DraftKings' deceptive practices apply almost identically to all members of the Class, a cessation of that action via injunctive relief would constitute a remedy appropriate for the entirety of the Class. *See* Fed. R. Civ. P. 23(b)(2).

75. All members of the Class encountered the same deceptive advertisements on DraftKings' website. All Class members acted upon those advertisements by depositing money under a proportionally identical deposit-match scheme. The predominate, perhaps dispositive issues in this case are whether DraftKings violated Florida's free gift advertising law by illegally conditioning the "free" deposit match upon obligations not initially presented to customers, and whether said actions and the deposit-match bonus scheme as a whole violated FDUTPA. This analysis must be applied to all 20,000 to 100,000 class members, who present claims that are identical in every aspect except the amount of money—from $1 to $600—they each deposited. If ever "questions of law or fact common to class members [have] predominate[d] over any questions affecting only individual members," this is the case. *See* Fed. R. Civ. P. 23(b)(3).

76. Most Class members' actual damages will total about $25. The cost of litigation will render individual actions—even in a small claims court—economically unviable. DraftKings can only effectively be deterred from deceiving and defrauding customers through maintenance of a class action. Based on the economic realities, the fact that the pertinent questions of fact and law are nearly identical among members of the Class, and the chaos that would stem from maintenance of 20,000 to 100,000 separate claims against DraftKings, class litigation is superior to every other available method for fairly and efficiently adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3).

## JURY TRIAL DEMAND

Plaintiff, individually and on behalf of the putative Class described herein, hereby demands a trial by jury as to all issues so triable.

## CONCLUSION

WHEREFORE, Plaintiff, in his own capacity and on behalf of the putative Class, hereby respectfully petitions this Honorable Court for the above-requested relief.

Dated: <u>January 28, 2015</u>.

                Respectfully Submitted,

                **Law Office of Mason Kerns**
                <u>Counsel for Plaintiffs</u>
                3178 New York Street
                Miami, Florida 33133
                305.725.8300
                masonkernslaw@gmail.com

                <u>*/s/ Mason Kerns*</u>
                Mason Kerns, Esq.
                Fla. Bar No. 91754
                *Pro Hoc Vice* Admission Pending

                <u>*/s/ Jerrod M. Paul*</u>
                Jerrod M. Paul, Esq.
                Local Counsel for Plaintiff Pending
                *Pro Hoc Vice* Admission of Mason Kerns, Esq.
                Fla. Bar. No. 92953